1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

10

11

12

13

DONALD C. FLORY,                              )
                                              )
            Plaintiff,                        )          CASE NO.      C06-1046-RSL-JPD
                                              )
       v.                                     )
                                              )
DONALD CLAUSSEN, *et al.*,                    )          REPORT & RECOMMENDATION
                                              )
            Defendants.                       )
_____)

14

## INTRODUCTION & SUMMARY CONCLUSION

15      Plaintiff, currently incarcerated in the Washington State Reformatory ("WSR") in Monroe,

16 Washington, has filed a *pro se* civil rights complaint pursuant to 42 U.S.C. § 1983.  Plaintiff alleges

17 that he was improperly terminated from his job at WSR approximately two years ago, and continues

18 to suffer consequences from the improper termination.  Defendants have filed a motion to dismiss

19 plaintiff's complaint and this action on the ground that plaintiff has not exhausted his administrative

20 remedies pursuant to 42 U.S.C. § 1997e(a).  Plaintiff has filed a response to the motion and

21 defendants have filed a reply.  Having reviewed the motion to dismiss and the balance of the record,

22 the court recommends that the motion to dismiss be denied and that the lawsuit be permitted to

23 proceed.

24

## BACKGROUND

25      The following facts are taken from plaintiff's pleadings and exhibits.  Defendants agree that

26 for the purposes of their motion to dismiss, plaintiff's allegations should be taken as true.  (Dkt. #19

REPORT & RECOMMENDATION
PAGE - 1

1   at 2).

2        Plaintiff worked in the "Tab Shop and Print Shop" at WSR for a total of seventeen years, and

3   received an "above average" evaluation in February 2004.  (Dkt. #7 at 3; Ex. A).  In November 2004,

4   a co-worker who happened to be plaintiff's cellmate, was reassigned from his job at the shop.  (*Id.* at

5   4).  A few weeks later, the co-worker's time card was mysteriously punched in at the shop on three

6   separate occasions, despite the fact that the co-worker no longer worked there.  (*Id.*, Ex. B).  Because

7   the co-worker's time card had been punched in at the same time as plaintiff's card, the shop

8   supervisor, Donald Claussen, suspected that plaintiff had punched both time cards.  On December 1,

9   2004, Mr. Claussen wrote an "Initial Serious Infraction Report," setting forth these allegations.  (*Id.*)

10  Mr. Claussen also removed plaintiff from his job at that time, but on the form reassigning plaintiff,

11  he cited "staff discretion" as the reason and did not mention the incident with the time cards.  (*Id.*,

12  Ex. J).

13       Officials at WSR apparently never followed up on Mr. Claussen's initial report.  The report

14  did not lead to a hearing or an official determination of whether plaintiff had broken any rules or

15  regulations by allegedly punching in the time card of his cellmate.  Instead, the matter was referred to

16  the prison's "Facility Risk Management Team" ("FRMT"), comprised of four staff members of the

17  prison.  (Dkt. #7 at 4; Ex. C).  On December 8, 2004, the FRMT recommended that plaintiff's "job

18  suspension" be upheld.  (*Id.* at Ex. E).  This recommendation seems to have been made without the

19  FRMT having interviewed any witnesses or conducted any investigation, other than to rely upon

20  Claussen's infraction report.  On the form containing the recommendation, the FRMT noted that

21  plaintiff "wishes to appeal the recommendation to uphold the suspension."  (*Id.*)  In response, the

22  FRMT apparently explained the appeal process to plaintiff, in accordance with which plaintiff was

23  given 24 hours to attach a written "appeal" to the FRMT's recommendation.  (*Id.*)

24       Pursuant to the FRMT's explanation of the appeal process, plaintiff wrote out a single page

25  "appeal" in which he argued that the FRMT's recommendation was "based only on the fact that the

26  persons [sic] time card that is in question, is my cell mate and long time friend. . . . There was no

REPORT & RECOMMENDATION
PAGE - 2

1  evidence presented to show that I scanned [the cellmate's] card in. . . . In closing, I ask you to review

2  this decision.  And to make a determination based on the facts I am also attaching a list of ten

3  questions I already had typed up."  (*Id.*, Ex. F, G).

4          The FRMT's recommendation was reviewed by Howard Anderson, "Review Committee

5  Chairperson" at the prison.  Mr. Anderson concurred with the recommendation, although he noted

6  that "an infraction was not initiated and [plaintiff's] termination [was] based upon circumstantial

7  evidence . . . ." (Dkt. #7, Ex. E).  In light of these extenuating circumstances, Anderson directed that

8  plaintiff should not be placed "on cell assignment" and that he should retain his earned time.  (*Id.*)

9          From December 2004 until the present, it appears that plaintiff has been trying to get his job

10  back, to no avail.  On January 3, 2006, plaintiff filed a grievance with the Washington Department of

11  Corrections challenging the refusal of  "class II supervisors" to hire him back.  (Dkt. #18, Ex. M-1).

12  His grievance was rejected on the ground that such "classification" decisions were "non-grievable."

13  (*Id.*)  He appealed that decision to the next level and received the same response.  (*Id.*, Ex. M-2).  He

14  appealed to the final level and his appeal was rejected on the same ground.  (*Id.*, Ex. M-4).

15          Plaintiff's difficulty in getting rehired is illustrated by a letter that Naomi Neill, General

16  Manager of Correctional Industries at the prison, wrote to him in February 2006.  The letter states

17  that plaintiff was terminated from his job due to "time clock fraud," for which he had "received a

18  Serious Infraction."  (Dkt. #7, Ex. D).  Ms. Neill remarks that "[w]e take extremely serious the fact

19  that you were punching in [his cellmate's time card] when he no longer worked for Correctional

20  Industries."  (*Id.*)  The letter concludes:  "You will not be rehired."  (*Id.*)

21          Plaintiff filed a second grievance with the Washington Department of Corrections on April

22  10, 2006, contending that Ms. Neill's letter made false and slanderous statements.  Plaintiff asserted

23  that he had never been found guilty of an infraction for the time card incident, and sought to have

24  Ms. Neill's letter expunged from his file.  (*Id.*, Ex. M-13).  As with his earlier grievance, plaintiff's

25  grievance challenging Ms. Neill's letter was rejected as raising a non-grievable issue.  (*Id.*, Ex. M-

26  14).  His final appeal was rejected on this ground by Devon Schrum, the Grievance Program

REPORT & RECOMMENDATION
PAGE - 3

1    Manager for the Department of Corrections.  (*Id.*, Ex. M-16).

2                                PROCEDURAL HISTORY

3           On August 18, 2006, plaintiff filed the instant civil rights complaint.  (Dkt.#7).  The

4    complaint alleges that plaintiff's termination from his job and the prison's subsequent refusal to

5    rehire him have violated his constitutional rights.  (Dkt. #7 at 8).  For relief, plaintiff seeks, among

6    other things, to have his job reinstated and to have all references to the time clock incident expunged

7    from his record.  (*Id.* at 9).

8           On September 20, 2006, defendants filed a motion to dismiss, in which they assert that

9    plaintiff's lawsuit should be dismissed because he failed to exhaust administrative remedies.  (Dkt.

10   #17).  Plaintiff filed a response to defendants' motion to dismiss (Dkt. #18) and defendants have filed

11   a reply.  (Dkt. #19).  The matter is now ready for review.

12                                    DISCUSSION

13          The court may grant a motion to dismiss "if it appears beyond doubt that the plaintiff can

14   prove no set of facts in support of his claim that would entitle him to relief."  *Keniston v. Roberts*,

15   717 F.2d 1295, 1300 (9th Cir. 1983).  In reviewing a motion to dismiss, the court must treat plaintiff's

16   allegations as true and construe those allegations liberally in favor of plaintiff.  *See Shermsan v.*

17   *Yakahi*, 549 F.2d 1287, 1290 (9th Cir. 1977).  When the issue is whether plaintiff has exhausted

18   administrative remedies, the court may consider documents beyond the pleadings.  *See Wyatt v.*

19   *Terhune*, 315 F.2d 1108, 1119-20 (9th Cir. 2003).

20          Defendants argue that plaintiff has failed to exhaust his administrative remedies, as required

21   by 42 U.S.C. § 1997e(a), which was enacted in 1996 as part of the Prison Litigation Reform Act,

22   Pub. L. No. 104-134, 110 Stat. 1321.  Section 1997e(a) provides:

23          No action shall be brought with respect to prison conditions under section 1983 of this
            title, or any other Federal law, by a prisoner confined in any jail, prison, or other
24          correctional facility *until such administrative remedies as are available are exhausted.*

25   42 U.S.C. § 1997e(a) (emphasis added).

26          The Supreme Court has interpreted this statute on several occasions.  In *Porter v. Nussle*,

REPORT & RECOMMENDATION
PAGE - 4

1   122 S. Ct. 983, 988 (2002), the Court traced the evolution of the exhaustion requirement and held

2   that exhaustion is now a precondition for a prisoner to bring an action pursuant to § 1983.  The

3   Court found that Congress's chief goal in enacting the statute was "to reduce the quantity and

4   improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time

5   and opportunity to address complaints internally before allowing the initiation of a federal case."

6   (*Id.*)  In *Woodford v. Ngo*, 126 S. Ct. 2378 (2006), the Court again cited, as the main reason behind

7   exhaustion, the need to afford prison officials the opportunity to address complaints internally.  *Id.*

8   at 2387.  The Court went on in *Woodford* to hold that in order to give prison officials a fair

9   opportunity to resolve a complaint, an inmate must bring that complaint in a timely manner to the

10  officials' attention.  *Id.* at 2388.

11          Defendants contend that plaintiff failed to exhaust his administrative remedies because he did

12  not file a grievance regarding his job termination, pursuant to the grievance system administered by

13  the Washington Department of Corrections.  This system has four different levels of review.  (Dkt.

14  #17, Ex. 1 at 2-3).  Defendants acknowledge that plaintiff did file grievances in 2006, complaining

15  about prison officials' refusal to rehire him, but defendants contend that this issue is distinct from

16  his termination in 2004, and that plaintiff's complaint in the instant § 1983 action concerns only his

17  termination.  (Dkt. #19 at 3).  Therefore, defendants argue, the termination issue has not been

18  exhausted and the complaint should be dismissed.

19          The court does not find defendants' argument persuasive.  First, the argument ignores the

20  fact that plaintiff appears to have followed defendants' advice on how to "appeal" the FRMT's

21  decision upholding his job termination.   (Dkt. #7, Ex. E, F).  Defendants should not now be

22  permitted to fault plaintiff for following their instructions.  *Cf. Kikumura v. Osagie*, 461 F.3d 1269,

23  1285 (10th Cir. 2006) (finding that a prisoner could not be faulted for filing a grievance that lacked

24  certain information when the Bureau of Prisons had provided no notice that such information was

25  required).

26          Second, defendants' reliance on *Woodford v. Ngo* is misplaced.  The Court in *Woodford* held

1  that a prisoner's administrative complaint must be timely filed; the Court did not address a situation

2  like the present in which a prisoner unwittingly files a complaint with the wrong entity.  While the

3  Court has not addressed the instant situation, the Court has cautioned against the "the creation of an

4  additional procedural technicality. . . in a statutory scheme in which laymen, unassisted by trained

5  lawyers, initiate the process."  *Love v. Pullman Co.*, 404 U.S. 522, 526-27 (1972).  To hold an

6  inmate who is proceeding *pro se* accountable for failing to discover where he must file a complaint

7  in order to properly exhaust his administrative remedies, in the face of conflicting advice by prison

8  officials, would seem to be creating just such "an additional procedural technicality," that the

9  Supreme Court has counseled against.  Indeed, such a requirement would seem tantamount to a trap

10  for the unwary.[1]

11       Finally, the court notes an inconsistency inherent in the pleadings filed by defendants.  In

12  response to petitioner's argument that it was unnecessary for him to file a grievance in 2004 for his

13  job termination, because the issue would have been rejected as "non-grievable," (Dkt. #18 at 2-3),

14  defendants assert that "[t]his is simply not true." (Dkt. #19 at 4).  In support of this assertion,

15  defendants attach a declaration by Devon Schrum in which Mr. Schrum states:  "As the DOC

16  Grievance Program Manager, I have the ability to review determinations that an issue is not

17  grievable under DOC policy and address the merits of the grievance." (Dkt. #19, Ex. 1 at 1).

18  However, Mr. Schrum's purported willingness to address the merits of a grievance that has been

19  previously rejected as non-grievable, is undermined by the fact that on April 28, 2006, Mr. Schrum

20  denied plaintiff's grievance related to Ms. Neill's comments, stating that he agreed with the local

21  grievance coordinator that the issue was non-grievable.  (Dkt. #18, Ex. M-16).

22       In sum, it appears that plaintiff did exhaust his administrative remedies when, following the

23  apparent instructions of prison officials, he "appealed" the FRMT's recommendation that his job

24  _____

25       [1]  Interestingly, one of the prisoner's arguments in *Woodford* was that interpreting the
    exhaustion requirement too strictly could  "lead prison administrators to devise procedural

26  requirements that are designed to trap unwary prisoners and thus to defeat their claims."  126 S.Ct. at
    2392.  The *Woodford* Court refused to consider the argument, which it termed "speculative."  *Id.*

REPORT & RECOMMENDATION
PAGE - 6

1    termination be upheld.  That appeal gave prison officials a fair opportunity to resolve the matter

2    internally, which is the purpose underlying the exhaustion requirement.  *See Woodford v. Ngo*, 126

3    S. Ct. 2378, 2387 (2006).  Accordingly, plaintiff's § 1983 action here should be allowed to proceed.

4                                                  CONCLUSION

5            For the foregoing reasons, the court recommends that defendants' motion to dismiss be

6    denied.  A proposed Order accompanies this Report and Recommendation.[2]

7            DATED this 24th day of October, 2006.

8                                                          *James P. Donohue*
                                                           _____
9                                                          JAMES P. DONOHUE
                                                           United States Magistrate Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    _____

25        [2]  Defendants maintain that plaintiff has not served defendant Alex McEwen with the
      complaint and that, therefore, the lawsuit may not proceed against him.  (Dkt. #17 at 1, n.1).
26    However, the record reflects that defendant McEwen returned his waiver of service on September 8,
      2006.  (Dkt. #15).  Accordingly, the lawsuit may proceed against him and all other defendants.

REPORT & RECOMMENDATION
PAGE - 7